ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
LKJ Crabbe Inc. ) ASBCA No. 60331
)
Under Contract No. W9124E-15-D-0002 )

APPEARANCE FOR THE APPELLANT:        Mr. Kevin Crabbe
                                     President

APPEARANCES FOR THE GOVERNMENT:      Raymond M. Saunders, Esq.
                                     Army Chief Trial Attorney
                                     CPT Harry M. Parent III, JA
                                     Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal arises from Contract No. W9124E-15-D-0002 (the contract) between appellant, LKJ Crabbe Inc. (LKJ Crabbe or appellant), and the Army Mission and Installation Contracting Command – Fort Bragg (Army or government) for custodial services at buildings located in two different locations at Ft. Polk, Louisiana. LKJ Crabbe appeals the Army's termination for cause, contending that the Army's termination was unjustified and that the Army breached the contract by failing to reform the contract after learning of an alleged mistake in LKJ Crabbe's bid. LKJ Crabbe also alleges that the Army breached the contract by violating its duty of good faith and fair dealing. The appeal is denied.

FINDINGS OF FACT

A.    Solicitation and Bids

1. On January 7, 2015, the Army issued a solicitation to fulfill a requirement from the Fort Polk Department of Public Works for custodial services for various buildings and activities located on North and South Fort Polk and the Toledo Bend Army Recreation Site (TBRS) at Ft. Polk, Louisiana (R4, tab 17).

2. The requirement was set aside for a HUBZone Small Business and the award process was conducted in accordance with Federal Acquisition Regulation (FAR) Part 14 sealed bidding procedures (R4, tab 17 at 1).

3. The Army issued three amendments to the solicitation. Amendment Nos. 0001 and 0003 both pertained to the bid opening date. Amendment No. 0002, dated March 17, 2015, released (among other things) all questions and answers received from contractors during the solicitation period (R4, tab 19 at 5-12).

4. Fifteen (15) bids were received in response to the invitation to bid. LKJ Crabbe's bid was the lowest total bid amount received. (R4, tab 22 at 2)

## B.    Price Analysis and Contract Award

5. Ronald Newlan was the contracting officer (CO) responsible for awarding the contract (tr. 1/84; R4, tab 1 at 1). Mr. Newlan determined whether appellant's price was fair and reasonable (R4, tab 22), and conducted an unbalanced price analysis (tr. 1/91; R4, tab 22 at 2).

6. Mr. Newlan developed a pricing matrix that compared pricing from all offerors for the base year and option years by contract line item number (CLIN). A condensed version of this document is located at tab 21 of the Rule 4 file. (R4, tab 21)

7. Mr. Newlan concluded that the bids were materially balanced in accordance with FAR 15.404-1(g) (R4, tab 22 at 2).

8. Mr. Newlan testified that his unbalanced price analysis sought to determine whether there was consistency in the prices for each CLIN across the base and option years. He testified that the bids were balanced in this case, because each CLIN was priced the same across the base and option years. (Tr. 1/141) His analysis did not compare individual CLINs to other CLINs within the same year, nor did it compare the pricing for particular types of buildings. He acknowledged that his analysis did not include calculating a price per square foot for appellant or any of the offerors. (Tr. 1/93-97)

9. Mr. Newlan also determined that appellant's price was fair and reasonable pursuant to FAR 15.404-1(b)(2)(i), Commercial and Non-Commercial Items. Mr. Newlan conducted the fair and reasonable price determination by comparing the proposed bids received in response to the solicitation. (R4, tab 22 at 2)

10. Appellant's bid for CLIN 0110 for "Routine Project Cleaning" was $0.0095 per square foot (R4, tab 1 at 111; tr. 1/117).

11. The Army's solicitation procurement desktop computer system (PD2) only accepts entries up to two decimal places (tr. 1/110-11, 113). The system automatically rounded up appellant's proposed price of $0.0095 per square foot to $0.01 per square foot for CLIN 0110 (tr. 1/114-16, 127-28).

12. Mr. Newlan testified that he did not know whether the government had entered appellant's price into the procurement system as $0.0095 or $0.01. He further testified that, if the government had entered 0.0095 as the price, the system automatically would have rounded it to 0.01, because the government's payment system only goes to two decimal places. (Tr. 1/115)

2

13. The contract, as awarded, listed the price of $0.0095 per square foot for CLIN 0110 (R4, tab 1 at 111).

14. Mr. Newlan did not seek clarification from appellant regarding whether appellant intended its bid to be rounded up to $0.01 per square foot (tr. 1/112-30).

15. The pricing matrix, used by Mr. Newlan to compare the pricing from all the offerors for the base and option years by CLIN, listed appellant's price at $0.01 per square foot for CLIN 0110 (tr. 1/128-29; R4, tab 21).

16. There is no evidence that Mr. Newlan had knowledge that appellant's proposal price for CLIN 0110 was rounded up to $0.01 per square foot when he conducted his pricing analysis prior to award (tr. 1/128-30).

## C.    The Contract

17. On May 14, 2015, the Army awarded Contract No. W9124E-15-D-0002 (the contract) to LKJ Crabbe for "custodial services to various buildings and activities located on North and South Fort Polk and Toledo Bend (Lake) Recreation Site (TBRS)" (R4, tab 1 at 341). The indefinite-delivery, indefinite-quantity contract was for a one-year period of performance beginning July 1, 2015, and ending on June 30, 2016. The contract also included two 12-month option periods. (*Id.* at 342)

18. The contract terms included CLINs which required appellant to separately price the cleaning services for each building, a few additional miscellaneous items, and a single price for all the required cleaning supplies (R4, tab 1).

19. The contract incorporated Federal Acquisition Regulation (FAR) clause 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAY 2014), by reference (R4, tab 1 at 428). This clause states in relevant part:

> (c) *Changes*. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.
>
> ....
>
> (m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination

3

for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

20. The contract also incorporated by reference FAR clause 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) (R4, tab 1 at 430).

21. The contract included the full text of FAR clause 52.214-29, ORDER OF PRECEDENCE–SEALED BIDDING (JAN 1986), which states:

> Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications.

(R4, tab 1 at 440-41, tab 17 at 223)

22. On June 30, 2015, the Army issued Task Order (TO) 0001 against the indefinite-quantity, indefinite-delivery contract with a period of performance from July 1, 2015 through June 30, 2016, for $859,900 to clean 108 buildings (R4, tab 4 at 1, 60).

23. The Performance Work Statement (PWS) for the contract describes four categories of cleaning services: Installation, Fitness Centers, Child Care/Youth, and Project Cleaning (R4, tab 17 at 129-30).

24. For each category of cleaning service set forth in the PWS, individual cleaning tasks had to be performed according to the frequency set forth in technical exhibit 4 to the contract (R4, tab 1 at 392, tab 17 at 178).

## D.    Building 701

25. The contract contains a discrepancy concerning the level of cleaning required for Building 701 (CLIN 0019), one of the nine child care facilities included in the contract (R4, tab 17 at 8-9).

26. Building 701 was included in TO 0001 as requiring the "Child Care" level of cleaning as follows:

| Item No. | Supplies/Services | Quantity | Unit | Unit Price | Amount |
|---|---|---|---|---|---|
| 0019 | 0019 – Bldg 701 Child Care FFP<br>0019 – Bldg 701 Child Care<br>FOB: Destination<br>PURCHASE REQUEST<br>NUMBER: 0010711078 | 12 | Months | $800.00 | $9,600.00 |
| 0020 | 0020 – Bldg 702 Child Care FFP<br>0020 – Bldg 702 Child Care<br>FOB: Destination<br>PURCHASE REQUEST<br>NUMBER: 0010711078 | 12 | Months | $2,390.00 | $28,680.00 |

(R4, tab 4 at 11-12)

27. Technical exhibit 5 to the contract sets forth a "List of Facilities to Receive Services." However, Building 701 is inconsistently listed on technical exhibit 5 as receiving the "Installation" level of cleaning:

| Building Number | Activity | Cleaning Level | Square Footage |
|---|---|---|---|
| 701 | MWR, CDC/SAC | Installation | 14,895 |
| 702 | MWR, CDC | Child Care/Youth | 10,490 |

(R4, tab 1 at 395-97, tab 17 at 180-82)

28. Technical exhibit 4 to the contract sets forth a "Tasks and Frequency Table" and shows the frequency of cleaning for the child care facilities, with tasks ranging from daily to every two years (R4, tab 1 at 392, tab 17 at 178).

29. The PWS included the following provision relevant to the child care facilities:

> 1.4.3 Child Care/Youth Cleaning Services: Services will be provided to child care and youth facilities issued on task orders. Services include restroom cleaning & supply, drinking fountain cleaning, trash & recycle removal, carpet vacuuming & cleaning, hard floor sweeping & mopping, buffing, tile stripping & finishing, dusting, furniture cleaning, interior & exterior window washing, window treatment cleaning, food service cleaning, door & door frame cleaning and wall & woodwork scrubbing.

(R4, tab 1 at 342, tab 17 at 130)

5

30. Part 5 of the PWS, Specific Tasks, listed cleaning tasks for the child care facilities as well as other facilities (R4, tab 1 at 369-76, tab 17 at 155-62).

31. Appellant's representatives, Mr. and Mrs. Blazer, attended the site visit in January 2015 prior to contract award (R4, tab 23 at 3). Building 701 was included in the site visit (*id.* at 1).

32. On June 23, 2015, after performance had begun, appellant raised the issue of the discrepancy between the bid schedule and the technical exhibits with the CO (R4, tab 3 at 2).

33. Matthew Wiggins, the contract specialist assigned to the contract, responded by email, referencing contract clause FAR 52.214-29 and explaining that the CLIN in the schedule takes precedence over the technical exhibit (R4, tab 3 at 2; tr. 2/9).

34. At the hearing, the CO, Tamera Butler, admitted that the contract contains a discrepancy between the CLIN and technical exhibit 5 (tr. 2/11-13).

35. She maintained, however, that the discrepancy is resolved by FAR 52.214-29, Order of Precedence clause. She explained that the CLIN (also called the bid schedule) takes precedence over the technical exhibits. (Tr. 2/11-13)

36. According to appellant, the difference in pricing for Building 701 at the child care level versus the installation level of cleaning would be approximately $2,682 per year (tr. 1/38).

### E.    The Fitness Centers

37. Three fitness centers are included in the solicitation and contract. Technical exhibit 5 to the contract lists the facilities on the installation to receive services, including buildings 1262, 2276 and 3350. (R4, tab 1 at 395-97, tab 17 at 180-82) CLINs for all three fitness centers were included in TO 1 (R4, tab 4 at 19, 28, 38).

38. Technical exhibit 4 to the contract shows the frequency of cleaning for the fitness centers, with tasks ranging from daily to every two years (R4, tab 1 at 392, tab 17 at 178).

39. The PWS in the contract included the following provisions relevant to the fitness centers:

> 1.4 Scope: The Contractor shall perform custodial services to the standards in this contract and in a manner that will maintain a satisfactory facility condition and present a clean, neat, and professional appearance. All work performed by the contractor shall be in accordance with all applicable laws, regulations (including AR 420-1), and commercial practices.

6

> Services include: Installation, Fitness Centers, Child
> Care/Youth and Project Cleaning.
>
>     ....
>
> 1.4.2 Fitness Cleaning Services: Services will be provided to
> fitness centers issued on task orders. Services include
> restroom cleaning & supply, drinking fountain cleaning, trash
> & recycle removal, carpet vacuuming & cleaning, hard floor
> sweeping & mopping, buffing, tile stripping & finishing and
> dusting.

(R4, tab 1 at 341-42, tab 17 at 129-30)

40. Part 5 of the PWS, Specific Tasks, listed cleaning tasks for the fitness centers as well as other facilities (R4, tab 1 at 369-76, tab 17 at 155-62).

41. The solicitation stated that: "All offers are subject to all terms and conditions contained in this solicitation" (R4, tab 17 at 1).

42. Prior to contract award, a question was submitted to the CO regarding the fitness centers, and the following question and answer was added to the solicitation via Amendment No. 0002 on March 17, 2015:

> 4. TE [Technical Exhibit] #4 does not indicate if the fitness
> center is serviced on weekends. Please clarify.
> Yes, fitness centers will be serviced on the weekends when
> open.

(R4, tab 19 at 5)

43. Appellant's proposal included pricing for each of the fitness centers as follows: Buildings 1262 (CLIN 0035) at $3,040 per month; 2276 (CLIN 0053) at $2,750 per month; and 3350 (CLIN 0073) at $1,425 per month (R4, tab 1 at 36, 54, 74, 395-97; tr. 1/28-29). The total aggregate price for the fitness centers was $7,215 per month (tr. 1/29).

44. Appellant's proposal included providing services to the fitness centers on a daily basis only for Monday through Friday, not including weekends (tr. 1/26).

45. If appellant had included weekends in its proposed price, the price would have increased disproportionately due to the costs associated with hiring additional employees to cover the weekend days (tr. 1/29-31).

46. Appellant's proposed price for cleaning the fitness centers was at least 30 percent lower than it would have been if the price had included cleaning on weekends (tr. 1/29-30), reducing the price by at least $2,092 per month (tr. 1/30).

## F. Financial Losses during Contract Performance

47. The contract required appellant to clean 108 buildings for $732,300 annually or $61,025 per month (R4, tab 4 at 67-68). The total contract price was $859,900, $127,600 of which was for non-cleaning services (CLINs 0109-13) (*id.* at 1, 54-56).

48. Appellant estimated a profit of 15% (tr. 1/21), which equals $9,153.75 per month ($61,025 multiplied by 15 percent). Therefore, we conclude that appellant estimated its monthly cost of cleaning services to be $51,871.25 per month ($61,025.00 less $9,153.75 (profit)).

49. Appellant's estimate of total monthly losses resulting from the discrepancy in the cleaning level required for Building 701 was $2,682 (tr. 1/38).

50. The total monthly losses resulting from the discrepancy in cleaning frequency for the three fitness center buildings was at least $2,092 (tr. 1/30).

51. Taken together, appellant's total monthly loss resulting from the alleged breach was at least $4,774 ($2,682 plus $2,092) (tr. 1/38).

52. According to appellant, it was losing more than $27,000–$32,000 per month during the performance of the contract (R4, tab 10 at 5; tr. 1/25), which is far more than the sum of the alleged losses for Building 701 and the fitness centers.

53. The alleged breach, put in a light most favorable to appellant, would involve just 4 of the 108 buildings, and with a total monthly price adjustment of $4,774 (tr. 1/36-40).

## G. September 3, 2015 Meeting and Subsequent Show Cause Notice

54. In September 2015, just over two months after commencing performance, appellant requested a meeting with the Army to discuss the negative economic impact of contract performance upon appellant and to investigate possible remedies (R4, tab 13 at 2).

55. On September 3, 2015, the Army held a meeting with appellant at Ft. Polk (R4, tab 13 at 2). The attendees at the meeting were Mr. Crabbe on behalf of appellant, and Matthew Wiggins, Tamera Butler, Glenda Calcote, Simone Curtis and LTC Thomas Kelley on behalf of the government (tr. 1/154).

56. During the meeting, Mr. Wiggins, the Army's contract specialist, took notes to serve as a record of the meeting (R4, tab 7 at 5; tr. 1/53, 2/17). According to Mr. Wiggins' contemporaneous meeting notes, appellant stated the following:

> Mr. Crabbe then stated that in the month of July which was the first month of performance invoicing was $60,000.00 and their expenses was [sic] $110,000.00. Mr. Crabbe then stated that he was drowning in red ink (losses from the project). Mr. Crabbe then stated that in August alone there was a $26,000.00 loss. Mr. Crabbe stated that he did not see any recovery for LKJ Crabbe.... Mr. Crabbe stated that Building #701 and the Gyms were two big issues that was costing his company a lot due to the overtime as it was costing two people two extra days to complete the work....
>
> ...Mr. Crabbe then stated that the only solution that he sees is to let us revise our pricing, or to let the contractor work at no profit while the Government resolicits, and LKJ Crabbe sends certified cost and pricing data. Mr. Crabbe stated that his company was well above $100,000.00 in net losses with the award. ...
>
> ...Mr. Crabbe stated that in reality that the requirements were more than just a startup project and that the company had stepped way out of their comfort zone. Mr. Crabbe stated that they should not have done a project which encompassed an entire base.
>
> ....
>
> ...Mr. Crabbe did add that there was faulty pricing throughout the award, and the company had not understood the depth of the requirement.

(R4, tab 7 at 1-5; tr. 1/156)

57. Another meeting attendee, Ms. Simone Curtis, the Army's supervisory contract specialist, testified regarding the meeting:

> JUDGE WOODROW: I mean, was it your impression that if the situation remained unchanged, that LKJ Crabbe would be unable to continue performance?
>
> THE WITNESS: That is correct.

9

JUDGE WOODROW: Okay. And what, at that meeting, gave you that impression?

THE WITNESS: Because when we went to him and asked for reasonable assurances to be able to continue to perform, the response back was, from a financial standpoint we could not.

(Tr. 2/98)

58. Mr. Crabbe admits that the content of the Army's contemporaneous meeting notes are "mostly accurate," but "different in tone" from the meeting (tr. 1/19-20).

59. Mr. Crabbe suggested various alternatives that might have allowed appellant to continue performance, such as re-pricing certain CLINs or removing certain CLINs from the contract, but the Army did not take action on these alternatives (R4, tab 9 at 1-2; tr. 1/48-52).

## H.    Show Cause Notice

60. Following the meeting, on September 8, 2015, the Army sent appellant a show cause notice via email. The letter stated, "the Government is considering terminating the contract for cause under the provision FAR 52.212-4(m) of this contract." (R4, tab 8)

61. The letter specifically placed appellant on notice that the Army was considering appellant's statements at the September 3, 2015 meeting as an anticipatory repudiation of the contract:

> Based upon these discussions and correspondence, I take your comments to mean that you are advising the Government that absent an upward adjustment of the contract price, you will not continue to perform the contract beyond 30 September 2015.

(R4, tab 8)

62. The letter also directed appellant to respond as follows:

> Pending a final decision in this matter, it will be necessary to determine whether your anticipated failure to continue performance of services arose from causes beyond your control and without fault or negligence on your part. Furthermore, you are to provide me with adequate assurances of your ability (including, but not limited to, your financial ability) to continue performing this contract beyond

10

30 September 2015. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to the Contracting Officer, Mrs. Tamera Butler, 6661 Warrior Trail, Bldg 350, Fort Polk, LA, 71459 within 4 business days after receipt of this notice, or no later than 14 September 2015. Your failure to present adequate justification and assurances within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

(R4 tab 8)

63. On September 10, 2015, appellant responded to the show cause notice:

[We] realize the major contributing factor to the losses that we have sustained thus far were due to not understanding the level of service that would be required to perform to specifications during the course of the contract [and] [t]he level of occupancy and traffic in the buildings was not understood.... [W]e now realize that we overstepped our comfort zone.

[W]e feel we can absorb the losses that will be incurred by our company through the end of November.

(R4, tab 9 at 2)

64. On September 11, 2015, the Army requested additional assurances that LKJ Crabbe would be able to continue performance and asked appellant to further supplement its response by September 14, 2015 (R4, tab 9 at 1).

65. On September 16, 2015, LKJ Crabbe responded to the Army's show cause notice by email. Mr. Crabbe stated that the "company has and is sustaining catastrophic financial losses while performing the custodial services at Ft. Polk." He further stated that the "company is operating at a negative $137,036," and that this amount will grow "between $27,000 and $32,000 every month until we are forced to file bankruptcy." (R4, tab 10 at 5)

66. Mr. Crabbe stated that the company has "credit lines available that would enable us to perform beyond September 30, 2015 but to do so puts all of the other contracts with the government at risk of us having to default as well" (R4, tab 10 at 5).

11

67. On September 16, 2015, the CO asked appellant for additional clarification about the line of credit available to appellant and the other contracts that would be impacted (R4, tab 10 at 1-2).

68. On September 16, 2015, appellant responded, explaining that the company had a line of credit that potentially could allow it to perform beyond September 30, 2015. Mr. Crabbe stated that the availability of the credit line "was not an implied reference to being able to sustain the monthly losses we have incurred and will continue to incur if we continue at Ft. Polk." (R4, tab 10 at 1)

69. At the hearing, Mr. Crabbe explained that, without government cooperation to permit some type of change to the contract pricing, LKJ Crabbe would continue to lose tens of thousands of dollars per month (tr. 1/79).

## I.    Termination for Cause

70. On September 25, 2015, after evaluating appellant's responses to the show cause letter, the CO terminated the contract for cause "because of an inability to perform and failure to provide adequate assurance of continued performance." The CO set forth the basis for her determination in a memorandum for record. (R4, tab 12; tr. 2/27-29)

71. On September 25, 2015, appellant received notice of the termination for cause via email from the CO (R4, tab 14 at 2; tr. 2/28). The notice stated that the contract had been terminated for cause pursuant to FAR 52.212-4(m) which was incorporated into the contract. The termination was effective as of September 30, 2015. (R4, tab 12 at 1)

72. The notice further stated:

> You failed to provide adequate reasonable assurances that LKJ Crabbe, Inc. could continue to perform custodial services issued under Task Order 0001 for the performance period of 01 July 2015 through 30 June 2016.

(R4, tab 12 at 1)

73. On September 27, 2015, appellant acknowledged receipt of the notice for termination for cause (R4, tab 14 at 1-2).

74. On September 29, 2015, the CO modified both the base contract and TO 0001 in order to effectuate the termination for cause (R4, tabs 15-16).

12

## J.    Subsequent Appeal and Hearing

75. On November 19, 2015, appellant filed a notice of appeal dated November 16, 2015, with the Board, and, on November 20, 2015, the Board docketed the appeal as ASBCA No. 60331.

76. On March 21, 2017, the Board conducted a two-day hearing at the Board's offices in Falls Church, Virginia.

## DISCUSSION

### A. Termination for Default

A termination for default "is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). Though this is an appeal brought by LKJ Crabbe, because a termination for default is essentially a government claim, the government bears the initial burden of proving, "by a preponderance of the evidence, that a termination for default was justified." *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151; *Keystone Capital Services*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 (citing *Lisbon Contractors*, 828 F.2d at 765). "If the government establishes a *prima facie* case justifying the termination, the burden shifts to the contractor to prove the default was excusable." *Truckla Services, Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638 at 178,444 (citing *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312).

### 1. Appellant's Response to the Cure Notice

Appellant's failure to provide reasonable assurances of its ability to perform in response to the cure notice supports the Army's decision to terminate for cause. The contract incorporates by reference FAR 52.212-4, Contract Terms and Conditions – Commercial Items, which states, in relevant part:

> (m) *Termination for cause.* The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, *or fails to provide the Government, upon request, with adequate assurances of future performance.*

(Finding 15) (Emphasis added) Appellant's response to the show cause notice fails to provide reasonable assurances that it would be capable of performing for the full term of the contract.

13

Appellant's response to the Army's initial show cause notice indicated that appellant had failed to appreciate the level of service it would be required to perform and "overstepped [its] comfort zone" (finding 63). This statement is tantamount to an admission that poor pricing was the root cause of the losses on the contract. Appellant further stated that the company "can absorb the losses that will be incurred by our company through the end of November." (*Id.*) This is an unequivocal statement that appellant could not perform past the end of November, a full seven months prior to the end of the base performance period.

When the Army sought clarification of appellant's initial response, appellant explained that it was "sustaining catastrophic financial losses while performing the custodial services at Ft. Polk" that would grow "until we are forced to file bankruptcy" (finding 65). Appellant mentioned, however, that LKJ Crabbe had credit lines available that would enable it to perform beyond September 30, 2015 (finding 66). The Army sought additional clarification regarding the credit lines, and appellant clarified that the availability of the credit line "was not an implied reference to being able to sustain the monthly losses we have incurred and will continue to incur if we continue at Ft. Polk" (finding 68). By this statement, Mr. Crabbe affirmed, for a third time, that his company would be unable to perform to the end of the contract without some form of accommodation from the Army.

During his testimony, Mr. Crabbe emphasized that he repeatedly asked the Army to cooperate with him and suggested a variety of accommodations that would allow him to continue to perform (finding 69). However, Mr. Crabbe also was candid at the September 3, 2015 meeting that, without some form of accommodation, his company would not be able to complete the base period of performance without financial insolvency (findings 55-58). We find Mr. Crabbe's testimony to be credible, both with respect to his sincere interest in working constructively with the Army to pursue a reasonable accommodation, and with respect to the prospect of financial ruin if the contract were not modified.

Appellant's response to the cure notice fails adequately to assure the government that appellant could continue to perform to end of the contract period and, therefore, is an adequate basis for the termination for cause. *See SYMVIONICS, Inc.*, ASBCA Nos. 60335, 60612, 17-1 BCA ¶ 36,790 (termination for cause justified in face of failure to provide adequate assurances that inability to perform could be overcome). Indeed, the Army reasonably believed Mr. Crabbe's statements about the financial losses from continued performance and reasonably concluded that LKJ Crabbe could not continue to perform the contract as written.

### 2. Anticipatory Repudiation

Although the government need only prove one sufficient basis for a termination for cause, *Quality Trust Inc.*, ASBCA No. 59983, 16-1 BCA ¶ 36,368, we also conclude that appellant's statements were tantamount to an anticipatory repudiation of the contract

14

and that the government has made a prima facie case justifying the termination for cause on that basis as well.

In order to establish anticipatory repudiation, the government must show that a contractor communicated an intent not to perform in a positive, definite, unconditional and unequivocal manner. *James B. Beard*, ASBCA Nos. 42677, 42678, 93-3 BCA ¶ 25,976 at 129,171. Either an express refusal to perform, or a statement of an inability to perform may constitute anticipatory repudiation. *SYMVIONICS,* 17-1 BCA ¶ 36,790 at 178,321. In particular, a statement that a contractor is unable to perform unless the government modifies a contract constitutes anticipatory repudiation. *Cascade Pacific International v. United States*, 773 F.2d 287, 293 (Fed. Cir. 1985); *Tacoma Boatbuilding Co.*, ASBCA No. 50238, 00-1 BCA ¶ 30,590 at 151,068-69.

Appellant contends that it gave three different dates for when it would be forced to stop work without conditions being granted by the government. Appellant also offered, in the September 3, 2015 meeting, to continue working at cost with no allowance for profit (finding 56). Appellant argues that this fell well short of the "positive, definite, unconditional and unequivocal" refusal to perform required by the Board's precedent (app. br. at 27).

In response, the government contends that appellant made multiple statements that, taken together, "unequivocally communicated an intent not to perform the Contract through the end of the base period of performance without an increase in price." According to the government, these statements constituted an anticipatory repudiation of the contract and justified the CO's decision to terminate the contract for default. (Gov't br. at 27)

Appellant's communications with the government left little doubt that appellant's business would be harmed by continuing to perform the contract as written. Appellant, itself, requested the September 3, 2015 meeting due to concerns about economic losses it was incurring during performance (finding 54). During the meeting, Mr. Crabbe made statements indicating that appellant could not sustain performance for another 30 days. These statements were recorded in contemporaneous notes recorded by Mr. Wiggins, the Army's contract specialist. (Finding 56) At the hearing, Mr. Crabbe admitted that the statements attributed to him in the notes are accurate (finding 58). At the time of the meeting, there were 301 days left in the contract's base period (from July 1, 2015 through June 30, 2016). The fact that appellant gave different dates for when it would be forced to stop work without conditions being granted by the government does not change the fact that it communicated to the government that it could not complete the base period of the contract.

The Army also concluded that the major cause of the company's losses was faulty pricing throughout the contract. Although Mr. Crabbe raised Building 701 and the fitness centers as specific issues, the CO concluded that addressing these issues would not resolve the underlying problems with faulty pricing. (Finding 70)

15

Although the Army and Mr. Crabbe discussed alternatives that might have allowed appellant to continue performance, such as re-pricing certain CLINs or removing certain CLINs from the contract, the Army did not take action on these alternatives (finding 59). However, a party's refusal to perform its contractual obligations in the future without a change to the contract has been held to constitute anticipatory repudiation. *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719 at 170,954 (refusing to perform without a change to the contract is anticipatory repudiation); *Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA ¶ 28,225 at 140,941 (anticipatory repudiation where contractor manifested a positive and unequivocal intention not to render performance until it received a contract price increase). We do not doubt appellant's sincere desire to work with the Army to make changes to the contract to allow it to continue performance, but the Army is under no obligation to make changes to the contract to address appellant's financial inability to continue performance. A contractor ordinarily is responsible to provide sufficient financial resources for the performance of the contract; its financial incapacity is not a legitimate excuse for its failure to perform. *Rashed Elham Trading Co.*, ASBCA No. 58383 *et al.*, 17-1 BCA ¶ 36,869; *see also Danzig v. AEC Corp.*, 224 F.3d 1333, 1339 (Fed. Cir. 2000); *TGC Contracting Corp. v. United States*, 736 F.2d 1512, 1515 (Fed. Cir. 1984).

We conclude that appellant's statements were tantamount to an anticipatory repudiation of the contract and that the government has met its prima facie case justifying the termination for default.

**B. Whether Default was Excusable**

If the government carries its burden with respect to termination for default, the burden shifts to the contractor to demonstrate that its default was excusable, caused by the government's material breach, or that the CO's termination decision was arbitrary, capricious or an abuse of discretion. *Pyrotechnic Specialties, Inc.*, ASBCA No. 57890 *et al.*, 17-1 BCA ¶ 36,696 at 178,691; *see also U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,707.

Appellant advances several legal theories to excuse its default, but focuses on three main factual issues. First, appellant contends that the Army breached the contract with respect to the level of cleaning required for Building 701, one of the larger child development center buildings (app. br. at 24-25). Second, appellant contends that the Army breached the contract with respect to the frequency of cleaning required for the fitness center buildings (*id.* at 22-23, 26). Finally, appellant contends that the government unilaterally changed appellant's bid price when it input appellant's bid into its computer system and that appellant should have been notified of the mistake.

We address each of these factual contentions and associated legal theories in turn.

16

## 1. Building 701

The contract, as awarded, contains a clear discrepancy in the cleaning levels for Building 701 (finding 25). The government did not catch this discrepancy, either during the solicitation or after the award (finding 34). It was not detected until LKJ Crabbe raised the issue after award (finding 32). When appellant raised the issue with the government, the CO issued a Contractor Deficiency Report, arguing that any contractual ambiguity was resolved by the order of precedence of contract documents and that LKJ Crabbe should have known that the centers were to be cleaned seven days per week (finding 33).

### i.  Contract Interpretation

Established court precedent and rules of construction require that contract provisions should not be interpreted as conflicting with one another unless there is no other possible reasonable construction of the language. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Fed. Cir. 1965). In the event of a conflict between contract provisions, however, the Order of Precedence clause may be invoked to resolve the conflict. *Hensel Phelps Constr. Co. v. United States*, 886 F.2d 1296, 1298 (Fed. Cir. 1989).

The contract in this appeal contains the full text of FAR 52.214-29, ORDER OF PRECEDENCE–SEALED BIDDING (JAN 1986), which states:

> Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications.

(Finding 21)

Here, the contract contains a clear inconsistency in the cleaning levels for Building 701. Building 701 was included in CLIN 0019 in TO 0001 as requiring the "Child Care" level of cleaning (finding 26). However, Building 701 is listed on technical exhibit 5 as receiving the "Installation" level of cleaning (finding 27).

This clear inconsistency is plainly resolved by the Order of Precedence clause in the contract. Pursuant to FAR 52.214-29, the Schedule (setting forth each of the specific CLINs) is first in the order of precedence, superseding the "other documents, exhibits, and attachments," including technical exhibit 5 (finding 19). Thus, the government properly interpreted the contract to require "Child Care" level of cleaning in Building 701.

17

### ii.    Mistake in Bid

Appellant contends that the level of cleaning required for Building 701 was a mistake in bid and should have been addressed pursuant to FAR 14.407-4, Mistakes after award. According to appellant, a contract specialist lacks authority to make decisions on disputes with a contractor. (App. br. at 24-25)

Under FAR 14.407-4, a CO may in limited circumstances rescind or reform a contract where the contractor has reported a bid mistake post-award. Such determinations:

> [M]ay be made only on the basis of clear and convincing evidence that a mistake in bid was made. In addition, it must be clear that the mistake was...if unilaterally made by the contractor, so apparent as to have charged the contracting officer with notice of the probability of the mistake.

FAR 14.407-4(c), (2). This FAR provision then sets out procedures for the CO to follow in processing a mistake alleged after award. FAR 14.407-4(e).

To prevail on its mistake in bid theory, appellant must prove that the error is of the type that may be compensable and that the CO knew or show have known of the mistake at the time the bid was accepted. *DynCorp International LLC*, ASBCA No. 59244, 17-1 BCA ¶ 36,653 at 178,497. An error of judgment is not a compensable error. *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157-58 (Fed. Cir. 1987) ("It is well established that an erroneous bid based, like this one, upon a mistake in judgment does not entitle the contractor to reformation of its contract."); FAR 14.407-4.

In this appeal, appellant has not shown that the government knew, or should have known, of appellant's alleged mistake concerning its proposed price for CLIN 0019 for Building 701. The government's unbalanced price analysis focused only on whether there was consistency in the prices for each CLIN across the base and option years. The government did not compare individual CLINs to other CLINs within the same year, nor did it compare the pricing for particular types of buildings. (Finding 4) There was no way, therefore, for the government to know that appellant had underbid CLIN 0019. Moreover, because the government's unbalanced price analysis did not require it to compare prices on a per square foot basis across CLINs, there is no way that the government should have known appellant's price was too low for CLIN 0019. (Findings 7-8)

### 2.  Fitness Centers

Appellant's proposal included providing services to the three fitness centers on a daily basis only for Monday through Friday, not including weekends (findings 43-44). Amendment No. 0002 of the solicitation, which is incorporated into the contract, however, stated that "fitness centers will be serviced on the weekends when open"

(finding 42). If appellant had included weekends in its proposed price, its proposed price for the fitness centers would have been at least 30 percent greater had the price included cleaning on weekends (finding 46).

Appellant raises several legal issues with respect to the cleaning frequency of the fitness centers. First, appellant contends that the government possessed superior knowledge of the cleaning required for the fitness centers and failed to pass that information on to the bidders during the solicitation process (app. br. at 26). Second, appellant contends that the question-and-answer concerning the fitness centers during the solicitation created a latent ambiguity in the contract regarding whether the centers were to be cleaned on weekends (*id.*). Finally, appellant contends that the government acted in bad faith when appellant raised the ambiguity by issuing a deficiency report, instead of issuing an appealable CO decision (*id.* at 25).

### i.    Superior Knowledge and Latent Ambiguity

Appellant claims that the government had superior knowledge of the cleaning schedule for the fitness centers and failed to disclose that information to bidders during the solicitation, or to appellant immediately after award prior to the start of work, or to appellant after award (app. br. at 26). Indeed, appellant claims that the government did not disclose the cleaning schedule until after appellant had been performing for several weeks and customers were complaining about overflowing trash cans (*id.*).

Appellant's superior knowledge argument fails, because the contract expressly requires the fitness centers to be cleaned on weekends. Indeed, the contract included a question-and-answer specifically on this issue (finding 42). The inclusion of this question-and-answer also resolves any reasonable ambiguity about whether the contract requires the fitness centers to be cleaned on weekends. The statement that "the fitness centers will serviced on weekends when open" leaves no ambiguity about whether weekends are included. At most, this question-and-answer leaves open only the question of the specific weekend hours. Interpreting this phrase to mean that the fitness centers are never open on weekends – as appellant did when it omitted weekends from its bid – is outside the "zone of reasonableness" and is not sufficient to create ambiguity. "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *NVT Tech., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)).

### ii.    Good Faith and Fair Dealing

Appellant contends that the government violated its duty of good faith and fair dealing by failing to seek a formal determination from the CO when appellant pointed out an error in its bid concerning the cleaning frequency for the fitness centers (tr. 1/16-17; app. br. at 25). According to appellant, the government should have followed FAR 14.407-4 and issued a CO determination regarding appellant's alleged mistake in

19

the frequency of cleaning for the fitness centers (app. br. at 24). Instead, by issuing a contractor deficiency report, appellant argues that the government unfairly shifted the burden to it and forced it to do additional work outside the scope of its bid (*id.* at 25).

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *SIA Construction, Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986 (citing *Metcalf Construction Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). In this appeal, the evidence demonstrates that the government dealt fairly with LKJ Crabbe. The implied duty of good faith and fair dealing is limited by the original bargain: it prohibits acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014) (the implied duty of good faith and fair dealing "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions"). As we explained previously, the government is under no obligation to accommodate a contractor's financial inability to continue performance, because the contractor is responsible to provide sufficient financial resources for the performance of the contract. *Rashed Elham Trading Co.*, ASBCA No. 58383 *et al.*, 17-1 BCA ¶ 36,869 at 179,653.

Indeed, duty of good faith and fair dealing does not extend to an obligation to modify the terms of a contract to benefit a contractor in financial difficulty. *Highland Al Hujaz Co.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 (contractor's financial difficulties are not a legitimate excuse for its default).

### 3. Unilateral Mistake Concerning Appellant's Bid Price

Appellant contends that the government unilaterally changed appellant's bid price when it input appellant's bid into its computer system. Because the government pricing system accepted only prices up to two decimal places, appellant's proposed price of $0.0095 per sq. ft. was changed to $0.01 per sq. ft. (Finding 12) According to appellant, rounding up its proposed price increased appellant's total price by an additional $282,150, which would have prevented LKJ Crabbe from being the lowest bidder. Appellant contends that the Army should have notified appellant of the mistake and given appellant an opportunity to correct it pursuant to FAR 14.407. (App. br. at 23-24)

Appellant's argument fails to take into account the fact that it was the lowest bidder (finding 4) and the fact that the Army compared appellant's price against the prices of the other bidders *after rounding up appellant's price* (findings 15-16). Because appellant had the lowest price after its price was rounded up to $0.01 per sq. ft., and because using the proposed bid price of $0.0095 only would have reduced appellant's bid, we conclude that the clerical error—if any—had no effect on whether appellant would have won the award.

## 4. Alleged Breach was Not Material

Finally, even if we were to conclude that the government breached the contract under any of appellant's theories, it would not change our conclusion that the termination for cause was justified, because the breaches are not material.

A breach is material if it relates to a matter of vital importance or goes to the essence of the contract. *Tzell Airtrak Travel Grp. Corp.*, ASBCA No. 57313, 11-2 BCA ¶ 34,845 at 171,410 (citing *Thomas v. HUD*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)). The government concluded that the major cause of the company's losses was faulty pricing throughout the contract. Although Mr. Crabbe raised Building 701 and the fitness centers as specific issues, the CO concluded that addressing these issues would not resolve the underlying problems with faulty pricing. (Finding 70) Mr. Crabbe himself admitted that there was faulty pricing throughout the award and that the company had not understood the depth of the requirement (finding 56).

For example, even considering the acknowledged discrepancy in the Building 701 cleaning levels and the extra cost associated with cleaning the fitness centers on weekends – including extra staffing necessary to do so – the difference in price is less than $5,000 per month (finding 51), only a fraction of LKJ Crabbe's alleged $2,700-$32,000 monthly losses on the contract (finding 52).

The testimony and evidence at the hearing demonstrated that appellant's losses on the contract fundamentally were the result of faulty pricing throughout the contract. Even if we assume that the government was to blame for appellant's pricing on the three fitness centers and on the child development center building, the financial losses resulting from having underbid these items is far less than the monthly losses appellant sustained (findings 47-53).

## CONCLUSION

For these reasons, the appeal is denied.

Dated: October 29, 2018

_____
KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

21

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60331, Appeal of LKJ Crabbe Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals